# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN WILKINSON, | : | No. 4:15-cv-01916 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| MARVIN E. KLINGER, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DECEMBER 5, 2017

Before the Court for disposition is Defendant Marvin E. Klinger, Inc.'s

Motion for Summary Judgment.  For the following reasons, this Motion will be

granted in its entirety.

## I.     FACTUAL BACKGROUND

### A. Ms. Wilkinson's Employment History

On August 8, 1991, Plaintiff Susan J. Wilkinson ("Ms. Wilkinson") began

her employment as an at-will school bus driver for Defendant Marvin E. Klinger,

Inc. ("Defendant").[1]  In her application for employment, Ms. Wilkinson indicated

that she had no history of drug use and would voluntarily submit to a drug test.[2]

---

[1]   Def.'s Statement of Material Facts Pursuant to L.R. 56.1 ("Def.'s Statement of Material
      Facts")(ECF No. 29) ¶¶ 1 & 3, at 1; Pl.'s Answer to Def.'s Statement of Material Facts
      ("Pl.'s Answer to Def.'s Facts")(ECF No. 36) ¶¶ 1 & 3, at 1 & 2.

[2]   Def.'s Statement of Material Facts ¶ 2, at 1; Pl.'s Answer  to Def.'s Facts ¶ 2, at 1.

On January 26, 1995, Ms. Wilkinson received and signed Defendant's Drug and Alcohol Use and Testing Policy ("Drug Policy").[3] Ms. Wilkinson understood that this policy subjected her to drug testing,[4] and did not object to this practice.[5]

### B. Defendant Marvin E. Klinger, Inc.'s Drug & Alcohol Use & Testing Policy

Defendant, as a school bus contractor, has a government-mandated drug testing policy administered by First Advantage.[6] This drug policy, "concerned about alcohol abuse and illegal drug use," states, as its purpose, the promotion of a "safe, healthy, and productive work environment."[7] The drug policy prohibits, *inter alia*, the following conduct: (1) "using or being under the influence of legal drugs that are being used illegally," or (2) "using or being under the influence of legal drugs whose use can adversely affect the ability of the driver to perform his or her job safely."[8] For the purposes of the policy, however, "drugs" are defined as "any and all controlled substances, such as but not limited to, marijuana, cocaine, amphetamines, PCP, opiates . . . [and] includes prescription and over-the-counter medications which are being abused."[9]

---

[3]   Def.'s Statement of Material Facts ¶ 6, at 1; Pl.'s Answer to Def.'s Facts ¶ 6, at 2.

[4]   Dep. of Susan Wilkinson (ECF No.35-3), at 12:12-16.

[5]   *Id.* at 12:17-21.

[6]   Def.'s Statement of Material Facts ¶ 31, at 4; Pl.'s Answer to Def.'s Facts ¶ 31, at 4.

[7]   Marvin E. Klinger Inc. Drug & Alcohol Use & Testing Policy (ECF No. 5-1), at 1.

[8]   *Id.* at 2.

[9]   *Id.* at 2.

This Policy further provides for "random testing," or unannounced testing, in which "the driver must report to the collection site immediately after receiving notice of their selection."[10] Under "Test Procedures," random drug testing, along with pre-employment, post-accident, and reasonable suspicion drug testing, follows the below procedure:

1.      The applicant/employee will provide a urine sample at the assigned collection site at the appointed time.

2.      The applicant/employee will participate in the chain of custody procedures in order to insure accurate collection by

providing photo identification.

completing and signing consent, release of information and Chain of Custody forms.

following DOT/FEDERAL urine collection procedures in cooperation with the collection Site.

3.      Under split specimen procedures, the donor must provide 45 ml. in a specimen container. The collector will pour 30 ml. into one bottle and seal it, the remaining sample of 15 ml. will be sealed in a second bottle. Both bottles will be sent to the laboratory. The bottle with 30 ml. will be the primary specimen and the second bottle will be held by the laboratory and analyzed only after a verified positive by the MRO and the employee requests the analysis within 72 hours of notification by the MRO.

4.      If the applicant/employee refuses to provide the specimen for drug testing, the situation will be considered equal to a positive test and the same consequences will apply.

---

[10]    *Id.* at 3.

C. All positive urine screens will be confirmed through GC/MS testing (Gas Chromatography/Mass Spectrometry) before any discipline is imposed or hiring decisions are made.

D. A Medical Review Officer (MRO) will review all DOT regulated drug tests performed by the laboratory. **The MRO is to determine whether positive test results indicate illegal drug use or whether other medical explanations could account for the result**. The MRO will inform the employee of his findings.

On all "positive" drug screen test results, the MRO will make two attempts on two consecutive days to first contact the applicant/employee and review his findings. If the applicant/employee cannot be reached during the above mentioned time frame, the company management will be contacted and informed to contact the applicant/employee and have such person make themselves available to be contacted by the MRO to review his findings. If the applicant/employee does not make themselves available to be contacted by the MRO, the consequences to the applicant/employee will be equal to that of a positive test result, which is immediate discipline, up to and including termination.[11]

The policy further provides that "[t]he consequence of testing positive for drugs is: Termination."[12] Ms. Wilkinson understood this consequence for a positive drug test.[13]

In his deposition, Stuart Hoffman, M.D.—Chief Medical Review Officer of First Advantage—described the process of reviewing positive drug test results as follows.[14] First, he noted that the actual testing is performed by one of 30

---

[11] *Id.* at 5–6 (emphasis added).

[12] *Id.* at 7.

[13] Def.'s Statement of Material Facts ¶ 9, at 2; Pl.'s Answer to Def.'s Facts ¶ 9, at 2.

[14] Def.'s Statement of Material Facts ¶ 42, at 5; Pl.'s Answer to Def.'s Facts ¶ 42, at 5.

federally-certified laboratories using mass spectrometry and gas chromatography.[15]

Upon receipt of positive test results from those laboratories, Dr. Hoffman testified

that a medical review officer, in this case Dr. Lipshutz, will attempt to determine,

*via* telephone conversation with the donor, if there is a legitimate medical

explanation for the substance reported.[16]  At the conclusion of this telephone

conversation, the medical review officer will typically request prescription

information which would be verified at the pharmacy.[17]

### C. Ms. Wilkinson's Positive Drug Test

On November 21, 2014, Ms. Wilkinson was selected for random drug

testing and presented to Back 2 Back Chiropractic to provide a sample in

accordance with the above policy.[18]  Earlier in the day, following her morning bus

route, Ms. Wilkinson had taken Vicodin for her sciatica.[19]  Ms. Wilkinson had a

valid prescription for Vicodin from her doctor for treatment of pain.[20]

On November 26, 2014, Ms. Wilkinson was contacted by an individual from

the drug testing company—First Advantage.[21]  During that conversation, Ms.

---

[15]   Def.'s Statement of Material Facts ¶ 46, at 6; Pl.'s Answer to Def.'s Facts ¶ 46, at 5.

[16]   Def.'s Statement of Material Facts ¶¶ 43-44, at 6; Pl.'s Answer to Def.'s Facts ¶¶ 43-44, at 5.

[17]   *Id.*

[18]   Def.'s Statement of Material Facts ¶ 17, at 3; Pl.'s Answer to Def.'s Facts ¶ 17, at 2.

[19]   Def.'s Statement of Material Facts ¶ 14, at 2; Pl.'s Answer to Def.'s Facts ¶ 14, at 2.

[20]   Dep. of Susan Wilkinson (ECF No. 35-3), Exh. 4, Family Practice Center, PC Medical Records, at page 48.

[21]   Def.'s Statement of Material Facts ¶ 18, at 3; Pl.'s Answer to Def.'s Facts ¶ 18, at 3.

Wilkinson expressed that the positive drug test was the result of her prior ingestion of Vicodin.[22] She called the drug testing company several days later because she thought the results to be in error. She again stated to the company that she had taken a pain pill earlier in the day.[23] Ms. Wilkinson does not recall submitting medical information to the drug testing company.[24] This lack of supporting medical documentation is confirmed by the drug testing company's records.[25][26] On December 2, 2014, Defendant, through Michael Klinger, was informed the results of Ms. Wilkinson's unrebutted, positive drug test.[27] First Advantage further indicated that Ms. Wilkinson needed to be taken off the road.[28]

---

[22] Pl.'s Answer to Def.'s Facts ¶ 18, at 3 (citing Dep. of Susan Wilkinson (ECF No. 35-3), at 44:3–6).

[23] Def.'s Statement of Material Facts ¶ 19, at 3; Pl.'s Answer to Def.'s Facts ¶ 19, at 3.

[24] Def.'s Statement of Material Facts ¶ 20, at 3; Pl.'s Answer to Def.'s Facts ¶ 20, at 3.

[25] Dep. of Susan Wilkinson (ECF No. 35-3), Exh. 6, First Advantage PC Medical Records, at page 50.

[26] Ms. Wilkinson disputes in her deposition whether she was told to submit supporting documentation. *See* Dep. of Susan Wilkinson (ECF No. 35-3), at 44:23–25. This dispute will not preclude the imposition of summary judgment in favor of Defendant as it fails to cast doubt on Defendant's reliance on the positive, unrebutted test results as conveyed, and relates not to the actions or motives of Defendant, but rather First Advantage. *See Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex Corp. v. Catrett*, 477 U.S.317, 322 (1986) ("Facts that could alter the outcome are 'material facts'").

[27] Dep. of Susan Wilkinson (ECF No. 35-3), Exh. 6, First Advantage PC Medical Records, at page 50; *see also* Dep. of Michael Klinger (ECF No. 29-3), at 10:7-13.

[28] Def.'s Statement of Material Facts ¶ 38, at 5; Pl.'s Answer to Def.'s Facts ¶ 38, at 5.

## D. Ms. Wilkinson's Termination

After learning of these positive test results, Dennis Klinger[29] both called Ms. Wilkinson and later stopped at her home.[30] During these conversations, Mr. Klinger expressed to Ms. Wilkinson that she was being terminated as a result of this positive drug test and the subsequent loss of an S endorsement on her license.[31] Ms. Wilkinson then inquired if she could drive a van instead.[32] Mr. Klinger denied that request, stating that it was impossible because drug testing was also done on van drivers.[33] Mr. Klinger did however express that, if Ms. Wilkinson could get this issue straightened out with First Advantage, she could have her job back.[34] Ms. Wilkinson did not thereafter "straighten it out" or ask for a retest, because she believed that her termination was "cut and dried."[35]

## E. Procedural History

Ms. Wilkinson commenced this action against Defendant on October 2, 2015. In her original Complaint, she alleged five claims of employment

---

[29] Dennis Klinger is the manager of Marvin E. Klinger, Inc. *See* Def.'s Statement of Material Facts ¶ 30, at 4; Pl.'s Answer to Def.'s Facts ¶ 30, at 4.

[30] Dep. of Dennis Klinger (ECF No. 29-2), at 19:24—20:4. Def.'s Statement of Material Facts ¶ 22, at 3; Pl.'s Answer to Def.'s Facts ¶ 22, at 3.

[31] *Id.*

[32] Pl.'s Answer to Def.'s Facts ¶ 22, at 3.

[33] Dep. of Dennis Klinger (ECF No. 29-2), at 22:1-8.

[34] Def.'s Statement of Material Facts ¶ 23, at 4; Pl.'s Answer to Def.'s Facts ¶ 23, at 3.

[35] *Id.*

discrimination: (1) disability discrimination under the Americans with Disabilities Act ("ADA"); (2) age discrimination and retaliation under the Age Discrimination in Employment Act of 1967; (3) age and disability discrimination under the Pennsylvania Human Relations Act ("PHRA"); (4) wrongful discharge pursuant to state law; and (5) invasion of privacy/intrusion upon seclusion under state law.[36] Defendant thereafter filed a Motion to Dismiss on October 30, 2015, asking the Court to dismiss Ms. Wilkinson's Complaint in its entirety for failure to state a claim upon which relief can be granted.[37]

On May 3, 2016, I issued a Memorandum Opinion and accompanying Order which granted Defendant's motion as to the age discrimination claims, but allowed Ms. Wilkinson leave to file an Amended Complaint correcting the outlined deficiencies.[38] Rather than file an Amended Complaint, Ms. Wilkinson expressed to the Court her desire to proceed on the remaining claims.[39] Defendant thereafter answered, and the parties commenced factual discovery.[40]

Following the completion of discovery, Defendant filed a Motion for Summary Judgment seeking the entry of final judgment in its favor on all

---

[36] ECF No. 1.

[37] ECF No. 5.

[38] ECF Nos. 23 & 24.

[39] ECF No. 15.

[40] ECF No. 16.

remaining claims.[41]  This Motion has since been fully briefed, and is now ripe for disposition.[42]

## II.    LAW

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43]  A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[44]  To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[45]  When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[46]

## III.    ANALYSIS

### A. Ms. Wilkinson's Disability Discrimination Claims under the ADA and PHRA[47]

---

[41]  ECF No. 28.

[42]  ECF Nos. 32, 35, & 37.

[43]  Federal Rule of Civil Procedure 56(a).

[44]  *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[45]  Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[46]  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[47]  Ms. Wilkinson's disability discrimination claim under the PHRA is analyzed under the same framework as the ADA. *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012)

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[48] When the plaintiff's allegations of intentional discrimination are supported only by circumstantial evidence,[49] a court must follow the well-established *McDonnell-Douglas*[50] burden-shifting framework. That analysis proceeds as follows:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (citation omitted). Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[51]

### 1. Prima Facie Case

---

(noting that the Rehab Act, ADA, and PHRA are to be interpreted consistently, and with the same standard for determination of liability).

[48] 42 U.S.C. § 12112(a).

[49] In a footnote within her brief, Ms. Wilkinson argues that the facts as presented may constitute direct evidence of disability discrimination not requiring the McDonnell-Douglas burden shifting framework. *See* Pl.'s Br. at 12 n. 3. Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n. 4 (3d Cir. 1995). Here, the factual record contains no direct evidence demonstrating outright that Ms. Wilkinson was terminated as a result of her disability.

[50] 411 U.S. 792, 802–804 (1973).

[51] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802).

In this matter, Defendant first argues that summary judgment in its favor is appropriate for both the ADA and PHRA disability discrimination claims because Ms. Wilkinson has failed to adduce evidence establishing a *prima facie* case.  A *prima facie* case of disability discrimination—the first step of the *McDonnell-Douglas* framework — requires that plaintiff establish (1) that she is disabled within the meaning of the ADA, (2) that she is otherwise qualified for the job, with or without reasonable accommodations, and (3) that she was subjected to an adverse employment decision as a result of discrimination.[52]  Defendant argues that Ms. Wilkinson is not disabled within the meaning of the ADA, while appearing to concede the remaining elements of the prima facie case.

Under the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more major life activities . . . a record of such an impairment; or . . . being regarded as having such an impairment[.]"[53]  Federal regulations provide that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[54]  Here, Ms. Wilkinson argues that she has satisfied the definition of having a disability because she was in fact disabled

---

[52]   *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

[53]   42 U.S.C. § 12102(1)(A)–(C).

[54]   42 U.S.C. § 12102(2)(A).

due to her sciatica. In the alternative, Ms. Wilkinson argues that she was either (1) "regarded as disabled" by Defendant, or (2) had a record of such disability.

Ms. Wilkinson first argues that she is disabled within the meaning of the ADA because of her sciatic pain. A "physical impairment" is defined as:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine . . .[55]

A diagnosis alone, however, is insufficient to establish a disability under the ADA.[56] Rather, plaintiffs must also "offer[ ] evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."[57] "Substantially limits" "shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard."[58]

Viewing the evidence in the light most favorable to Ms. Wilkinson, I find that she has met this relaxed standard. Here, Ms. Wilkinson argues that she was disabled because she suffered from migraines and sciatic nerve pain "severe enough that [she] took medication and actually had a wooden block . . . on her gas

---

[55]  29 C.F.R. § 1630.2(h)(1).

[56]  *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 513 n. 5 (3d Cir.2001).

[57]  *Toyota Motor. Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002).

[58]  29 C.F.R. § 1630.2(j)(1)(i).

pedal to ease the pain."[59]  In her deposition, Ms. Wilkinson noted the ways in which her sciatica had limited major life activities, and stated that the wooden block installed on the gas pedal was necessary to ease the pain of her condition while working.[60]

I am skeptical as to whether the light evidence adduced by Ms. Wilkinson presents a genuine issue of material fact regarding whether her impairment substantially limited a major life activity.  However, because the Court ultimately finds that Ms. Wilkinson has failed to demonstrate that Defendant's proffered reasons for her termination were pretextual, it will assume, *arguendo,* that she has satisfied her *prima facie* case and will proceed to the next step of the *McDonnell Douglas* analysis.[61]

## 2.  Legitimate, Non-Discriminatory Reason

Under the *McDonnell Douglas* framework, the burden now shifts to Defendant to show a legitimate business purpose for the termination.[62]  Defendant has met this relatively thin burden of production.  Indeed, at the time of her termination, and in the time since that date, Defendant has argued that Ms.

---

[59]  Pl.'s Br. in Opp. ("Pl.'s Br.")(ECF No. 35), at 6.

[60]  Dep. of Susan J. Wilkinson (ECF No. 35-3) at 24:21-25:4; 26:8-13; 26:18-25.

[61]  *See Showers v. Endoscopy Center of Central Pennsylvania, LLC*, 58 F.Supp.3d 446, 465 (M.D.Pa. 2014)(Conner, C.J.) (while skeptical of whether fact issues existed on the *prima facie* case, proceeding to analyze under *McDonnell Douglas*); *McLean v. Abington Memorial Hosp.*, Civil Action No. 15-CV-671, 2015 WL 5439061, at *4 (E.D.Pa. Sept. 15, 2015).

[62]  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

Wilkinson was terminated as the result of her positive drug test, as communicated by the drug testing company.[63]  In his deposition, Michael Klinger specifically stated the following:

> Q. So I think your testimony is you took the call from Robert at First Advantage. And then what did you do after that, if anything?
>
> A. Well, I know I took the call. And like I said, he took me through the process of what they had done.
> And I know that they had --- I knew at that point, they had already spoken to Ms. Wilkinson. And they gave her a period of time to produce some documentation, which she told me she produced nothing, no documentation whatsoever. And that was when he said you need to get her off the road. Her CDL is no good. And that was a first for me.
>
> Q. So I guess what I'm asking is, when did you start to have this conversation with your brother and your father about terminating Ms. Wilkinson at that point?
>
> A. Probably about the time I hung up the phone and rounded them up, and said here's the deal. And I told them what the call was. We were strictly depending on First Advantage and we really had no other option.[64]

### 3. Pretext

Because Defendant has put forward a legitimate, non-discriminatory reason for her termination—Ms. Wilkinson's unrebutted, positive drug test, the burden therefore rests with the plaintiff to show that this "legitimate, non-discriminatory reason" was merely pretext for discriminatory animus.  In order to demonstrate that

---

[63]  Dep. of Dennis Klinger (ECF No. 29-2), at 17: 23–18:1.

[64]  Dep. of Michael Klinger (ECF No. 29-3), at 11:24–12:17.

Defendant's stated reason for termination was pretextual, Mrs. Wilkinson must "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[65]  This evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[66]  Under this framework, the plaintiff bears an admittedly "difficult burden,"[67] as he "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."[68]  This difficulty, however, is directly attributable to the "inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs."[69]

Here, the factual record contains no evidence from which a reasonable factfinder could "believe that an invidious discriminatory reason was more likely

---

[65]  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[66]  *Id.* (emphasis in original).

[67]  *Id.*

[68]  *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3rd Cir. 2006) (internal quotation marks and citation omitted).

[69]  *Fuentes*, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3rd Cir. 1992)).

than not a motivating or determinative cause of the employer's action."[70]  This

form of pretext is typically shown through evidence that (1) the plaintiff has

previously been discriminated against by the employer; (2) the employer has

discriminated against other persons with disabilities; or (3) the employer has

treated similarly situated persons without a disability more favorably.[71]  Indeed, the

record reveals that Ms. Wilkinson was a long standing employee of Defendant who

can point to no prior history of discrimination.[72]  She similarly has adduced no

evidence of similarly situated persons without a disability who received more

favorable treatment.

Ms. Wilkinson attempts to show pretext by arguing that the record contains

evidence from which a reasonable juror could disbelieve the Defendant's

articulated legitimate reason for her termination.  At the outset, I note that it is not

enough for her to "simply show that the employer's decision was wrong or

mistaken, since the factual dispute at issue is whether discriminatory animus

motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent."[73]  Instead, she "must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

---

[70]  *Id.* at 764.

[71]  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644–45 (3d Cir. 1998).

[72]  Dep. of Michael Klinger (ECF No. 29-3), at 9:17-24.

[73]  *Fuentes*, 32 F.3d at 765.

legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."[74]

Here, Ms. Wilkinson argues that a reasonable jury could find Defendant's justification for her termination to be pretext because (1) she was a long-time employee with no record of safety concerns or discipline, (2) Dennis Klinger admitted Plaintiff *may* have told him she was taking medication, (3) Defendant made no effort to work with her after her failed drug test, (4) there is no evidence that First Advantage ever sent a letter to Defendant indicating that Ms. Wilkinson was unfit for duty, and (5) Defendant has no human resources department.[75] Each of these explanations, however, fail to demonstrate pretext.

First, while the undisputed facts demonstrate that Ms. Wilkinson had an otherwise unblemished employment history, this fact is insufficient to demonstrate that the legitimate, non-discriminatory reason advanced by Defendant—her positive drug test— is unworthy of credence. The Court is in agreement with Defendant that this method of showing pretext fails as a matter of law. Indeed, in *Kautz v. Met-Pro Corp.*, the United States Court of Appeals for the Third Circuit

---

[74]  *Id.* (emphasis in original) (internal quotation marks and citations omitted).

[75]  Pl.'s Br. at 11–12.

rejected an "attempt to use past positive performance reviews to show that more recent criticism was pretextual."[76]

Second, Ms. Wilkinson's attempt to show pretext through Dennis Klinger's "knowledge" of her prescription for pain medication is equally insufficient, and is in fact a distortion of the testimony. In his deposition, Dennis Klinger specifically stated the following on this issue:

Q. Did she tell you that she was taking prescribed medication?

A. I don't recall that.

Q. So it's possible she may have and you don't remember?

A. It's possible.

Q. Did she tell you that she was taking any type of medication?

A. No, I don't recall that.[77]

However, even if Dennis Klinger's testimony had affirmatively established his knowledge of her medical prescription, this fact itself would not be indicative of pretext. I note that the ultimate inquiry remains whether the factual record contains evidence from which a reasonable jury could disbelieve the employer's articulated legitimate reasons. Knowledge of a prescription for painkillers is

---

[76] *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005)(citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992)("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.")).

[77] Dep. of Dennis Klinger (ECF No. 29-2), at 20:5-13.

insufficient to discredit the reason advanced for the termination given both Defendant's reliance on the representations of First Advantage concerning Ms. Wilkinson's failure to produce supporting documentation and the lack of alternatives created by its own drug and alcohol policy.[78]

Ms. Wilkinson's additional premises of pretext —that there is no evidence that First Advantage ever sent a letter to Defendant indicating that Ms. Wilkinson was unfit for duty and that Defendant has no human resources department— similarly fail to demonstrate that Defendant did not believe or rely on the unrebutted, positive drug test results. Again, I note that while this evidence may be probative of mistake or lack of the utmost diligence, the ultimate issue remains "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[79] Indeed, in *Ballo v. Adecco*, an unpublished but substantially analogous case from the Eastern District of Pennsylvania, that court wrote the following concerning the application of a positive drug test:

> The most that can be said for Ballo's argument is that Adecco might have avoided this litigation through better communication with Ballo about his drug test results. But federal antidiscrimination laws only prohibit employment decisions based on impermissible factors such as age, race, and gender. Unfair or incorrect business decisions are not

---

[78] Dep. of Dennis Klinger (ECF No. 29-2), at 17:4-20; Dep. of Michael Klinger (ECF No. 29-3), at 11:24–12:17.

[79] *Fuentes*, 32 F.3d at 765.

covered. (Citations omitted). Accordingly, the Court grants Adecco's summary judgment motion on Ballo's ADEA disparate treatment claim.[80]

Given Ms. Wilkinson's long and unblemished employment history, better communication regarding her termination may have been advisable. Furthermore, while I am cognizant that the painkillers used were treatment for her alleged disability, I nevertheless note that "[t]hough an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability."[81] Here, no evidence exists sufficient to disbelieve that a positive drug test was the reason for her termination, nor does Ms. Wilkinson dispute the results of that test.[82] Because no reasonable jury could find for Ms. Wilkinson on this issue, no actionable discrimination claim survives.[83]

### 4. Failure to Accommodate Claim

Ms. Wilkinson next alleges that Defendant failed to accommodate her request to drive a van and thus did not engage in the interactive process required by the ADA. A plaintiff establishes that her employer violates its duty to engage in

---

[80] Civil Action No. 05-CV-5734, 2006 WL 1876569, at *6 (E.D.Pa. July 5, 2006).

[81] *Sever v. Postmaster Gen.*, 220 F. App'x 159, 161–62 (3d Cir.2007)(citing cases).

[82] Dep. of Susan Wilkinson (ECF No. 35-3), at 68:9-11 (Q. And you tested positive for drugs, whether you agree with that or not? A. Right).

[83] *See McLean v. Abington Memorial Hosp.*, Civil Action No. 15-CV-671, 2015 WL 5439061, at *5 (E.D.Pa. Sept. 15, 2015)(finding a lack of pretext where McLean had adduced no evidence showing the Hospital's proffered reasons for her termination lacked a factual basis and McLean had admitted to every instance of discipline for errors at issue).

the interactive process by showing that (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.[84]  The failure to engage in such a process, however, does not give rise to an independent cause of action, but rather is considered a component of the reasonable accommodation analysis.[85]

An employer is liable under that reasonable accommodations analysis if: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."[86]  "Once a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability and failed to, the employer has discriminated against the employee."[87]

---

[84]  *Taylor v. Phoenixville School District*, 184 F.3d 296, 319-20 (3d Cir. 1999).

[85]  *Whelan v. Teledyne Metalworking Prods.,* 226 F. App'x 141, 147 (3d Cir.2007).

[86]  *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams v. Phila. Hous. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004)).

[87]  *Ferreri v. Mac Motors, Inc.*, 138 F.Supp.2d 645, 650 n. 1 (E.D.Pa. 2001)(citations omitted).

In *Tayor v. Phoenixville Area School District*, the Third Circuit addressed the notice which must be given to an employer in order to constitute a request for a reasonable accommodation.[88] In that case, our Court of Appeals wrote the following:

> [W]hile the notice does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations *for that disability*."[89]

In *McLean v. v. Abington Memorial Hospital*, cited *supra*, an unpublished but persuasive case applying the above standard, the Eastern District of Pennsylvania granted summary judgment to an employer on a reasonable accommodation claim brought under the ADA.[90] In so doing, the District Court found that, although a request for transfer to a vacant position can constitute a request for a reasonable accommodation, plaintiff's claim nevertheless failed as a matter of law because said request for transfer did not relate to her sleep apnea disability, but rather was caused by a desire to change supervisors.[91]

In this matter, even accepting Ms. Wilkinson's assertion that Defendant knew of her diagnosis of sciatica, her ADA reasonable accommodation claim fails

---

[88] *Taylor*, 184 F.3d at 313.

[89] *Id.* (emphasis added).

[90] *McLean*, 2015 WL 5439061, at *8.

[91] *Id.*

because, like that in *McLean*, the accommodation requested was not for her disability, but rather as a possible end run around her failed drug test. Here, the undisputed facts specifically indicate that, when Dennis Klinger visited Ms. Wilkinson at her home on December 2, 2016, she requested reassignment to van driving.[92] Given the positive, and at this point—unrebutted results of the drug test, Mr. Klinger denied this request.[93] In his deposition, he stated the following as justification for this denial:

> Q. Are there other jobs that Ms. Wilkinson could have done at the company?
>
> A. Well, no. She asked if she would be able to drive a van for our company. But I explained that that wouldn't be an option because we also --- we also do drug testing on van drivers --- everyone, bus drivers, van drivers and so she wouldn't be able to do that.[94]

Mr. Klinger, however, suggested during their meeting that Ms. Wilkinson "communicate with the people at First Advantage," and, if the issue could be resolved, he would let her drive again.[95]

In sum, because Ms. Wilkinson's request to drive a van was not an accommodation for her disability and Defendant's drug policy otherwise called for her termination, she has failed to establish a *prima facie* case of failure to accommodate under the ADA. Based on the foregoing analysis, summary

---

[92] Dep. of Susan Wilkinson (ECF No. 35-3), at 55:19—56:6.

[93] Dep. of Dennis Klinger (ECF No. 29-2), at 22:1-8

[94] *Id.*

[95] Dep. of Dennis Klinger (ECF No. 29-2), at 23:13-20.

judgment will therefore be granted in favor of Defendant on Counts I and III, or

disability discrimination in violation of the ADA and PHRA.

### B. Ms. Wilkinson's Wrongful Discharge and Invasion of Privacy/Intrusion Upon Seclusion Claims.

Defendant next seeks summary judgment in its favor on Ms. Wilkinson's

claims of wrongful discharge based in tort and invasion of privacy/intrusion upon

seclusion, as contained in Counts IV and V.

In general, no cause of action exists for the termination of an at-will

employee, and an employee may be lawfully discharged for any reason or no

reason.[96]  Exceptions to this rule have been recognized in extremely limited

circumstances, where the termination of an employee would violate a "clear

mandate of public policy emanating from either the Pennsylvania Constitution or

statutory pronouncements."[97]  Public policy, however, "is not limited to 'that

which has been legislatively enacted.'"[98]  To be cognizable, non-legislatively

enacted public policy must be extremely clear and accepted virtually universally.[99]

Pennsylvania jurisprudence therefore demonstrates that exceptions to the at-will

---

[96] *See McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286 (Pa. 2000).

[97] *Weaver v. Harpster*, 975 A.2d 555, 556 (Pa. 2009).

[98] *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003)(quoting *Shick v. Shirey*, 716 A.2d 1231 (Pa. 1998)).

[99] *Id.* at 112. *See also Clark v. Modern Group Ltd.*, 9 F.3d 321, 328 (3d Cir. 1993)(provides detailed discussion of case law on the public policy exception).

employment doctrine "should be few and carefully sculpted so as not to erode an employer's inherent right to operate its business as it chooses."[100]

In *Borse v. Piece Goods Shop, Inc.*, for example, the United States Court of Appeals of the Third Circuit was presented with a wrongful discharge claim brought by a plaintiff who was terminated after refusing to take a drug test.[101] Addressing whether termination of an employee for refusal to consent to drug testing and to personal searches by an employer might violate public policy, the Third Circuit held that such a discharge "may violate the public policy embodied in the Pennsylvania cases recognizing a cause of action for tortious invasion of privacy."[102] Our Court of Appeals adopted the following "fact-intensive" analysis to determine whether the policy constituted a wrongful discharge action for tortious invasion of privacy:

> The test we believe that Pennsylvania would adopt balances the employee's privacy interest against the employer's interest in maintaining a drug-free workplace in order to determine whether a reasonable person would find the employer's program highly offensive.[103]

In essence, Defendant argues that its policy satisfies this *Borse* test because it respects an employee's privacy interest to the greatest extent possible consistent

---

[100] *Weaver v. Harpster*, 975 A.2d 555, 556 (Pa. 2009).

[101] 963 F.2d 611 (3d Cir. 1992).

[102] *Id.* at 613.

[103] *Id.* at 625.

with its express intent of protecting the children who ride on its school buses.[104]

Ms. Wilkinson, however, contends that summary judgment is inappropriate, as "any reasonable person would find an employer policy authorizing blanket discharge for any type of medication, regardless of whether it is prescribed by a physician, to be a violation of an important public policy."[105]  Ms. Wilkinson argues that, in *Rowles v. Automated Prod. Systems*, this Court was presented with a drug and alcohol policy, and denied summary judgment under *Borse* on the basis that "there are substantial unresolved issues of material fact which go to whether APS's drug and alcohol abuse policy, both on its face and in its implementation, constituted an invasion of Rowles' privacy."[106]  The Court reached this conclusion because the defendant's policy required plaintiff to "reveal private medical facts about himself, specifically, his epilepsy and the drugs he must take in order to control his condition" to his supervisor, and contained "no measures for excluding information about legally prescribed medications."[107]

---

[104]  Def.'s Br. in Supp. ("Def.'s Br.") at 12.

[105]  Pl.'s Br. at 15.

[106]  *Rowles v. Automated Prod. Sys.*, Civil Action No. 98-CV-0707, 1999 U.S. Dist Lexis 21605, at *41 (M.D.Pa. Mar. 26, 1999)(Rambo, C.J.).

[107]  *Id.* at *38

In the instant matter, summary judgment on counts IV[108] and V is appropriate for two reasons. First, under the Pennsylvania tort of invasion of privacy under "intrusion upon seclusion" theory, "an actor commits intentional intrusion only if he or she believes, or is substantially certain, that he or she lacks necessary legal or personal permission to commit intrusive act."[109] The undisputed facts of this case indicate that Ms. Wilkinson consented to the urinalysis drug testing in both a written consent form and a pattern of behavior. The factual record contains a written form signed by Ms. Wilkinson which demonstrates her consent to drug testing and Defendant's drug policy.[110] Moreover, in her deposition, Ms. Wilkinson stated the following concerning Defendant's practice of drug testing and her previous pattern of acquiescence:

> Q. And did you understand that you were subject to drug testing?
>
> A. Yes.
>
> Q. Did you have any problems with that?
>
> A. No, sir, I did not.

---

[108] The success of Counts IV and V—wrongful discharge and invasion of privacy based on an intrusion upon seclusion theory—is necessarily entangled because, in recognizing that "public policy that may, under certain circumstances, give rise to a wrongful discharge action related to urinalysis," the Third Circuit in *Borse* cited Pennsylvania common law concerning tortious invasion of privacy. *See Borse*, 963 F.2d at 620–21.

[109] *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989).

[110] Def.'s Statement of Material Facts ¶ 6, at 1; Pl.'s Answer to Def.'s Facts ¶ 6, at 2.

Q. Did you understand that you were subject to drug testing because you were a school bus driver?

A. Yes.

Q. Based on this policy and reading this policy, did you understand that you could be terminated if you tested positive for drugs?

A. Yes, I would imagine I did at that time.

. . .

Q. Did you ever have any objection – and you were tested more than once over the years?

A. Oh, yes. Many a time.

Q. Did you ever have any objection to being tested?

A. No, sir, I did not.

Q. Did you ever feel it was intrusive, an invasion of your privacy, that sort of thing?

A. No, sir.[111]

This consent by Plaintiff stands in contrast to *Borse*—the leading Third Circuit case on this issue, in which the plaintiff was fired for refusing to consent to a urinalysis test—and *Rowles*, a decision of this Court in which the plaintiff refused the drug test and was subsequently terminated.[112]

---

[111] Dep. of Susan Wilkinson (ECF No. 35-3), at 12:12-25; 13: 11-24. *See also* Dep. of Susan Wilkinson, Exh. 2, Marvin E. Klinger, Inc. Drug & Alcohol Use & Testing Policy, at 40 (showing signature of Susan Wilkinson acknowledging consent to such testing).

[112] *Borse*, 963 F.2d at 626; *Rowles*, 1999 U.S. Dist Lexis 21605, at *9. *See also Watson v. Vulcraft Sales Corp.*, Civil Action No. 12-CV-00628, 2012 WL 2572056, at *7 (W.D.Pa. July 2, 2012) ("Assuming *arguendo*, that Plaintiff had asserted a wrongful discharge claim, his public policy argument still would likely fail. The factual situation in this case differs

Second, even in the absence of explicit consent by Ms. Wilkinson, Defendant would still be entitled to summary judgment on this claim as no reasonable jury would finds its drug policy in violation of the *Borse* balancing test. In *Borse*, our Court of Appeals envisioned two ways in which an employer's urinalysis program might intrude upon an employee's seclusion. First, the *Borse* Court stated that "the manner in which the drug test is conducted may implicate tortious intrusion upon seclusion because 'there are few activities in our society more personal or private than the passing of urine.'"[113] In explaining this potential privacy concern, the Third Circuit noted that "many urinalysis programs monitor the collection of the urine specimen to ensure that the employee does not adulterate it or substitute a sample from another person."[114] The second way in which a urinalysis test may intrude upon an employee's seclusion is through the "'host of private medical facts about an employee, including whether she is epileptic, pregnant, or diabetic'" which it may reveal.[115]

The instant testing policy instituted by Defendant—and carried out by drug testing company First Advantage—does not implicate either of these concerns. First, there is no evidence within the factual record that the testing was performed

---

significantly from that of *Borse,* as Watson had agreed to drug testing, pursuant to signing Vulcraft's "Division Policies" form, where *Borse* did not consent.").

[113] 963 F.2d at 621 (quoting *Skinner v. Railway Labor Exec. Ass.*, 489 U.S. 602, 617 (1989)).

[114] *Id.*

[115] *Id.* (quoting *Skinner*, 489 U.S. at 617).

in a manner offensive to the reasonable person.  In the deposition of Stuart B. Hoffman, M.D.—Chief Medical Review Officer at First Advantage, he stated that testing is not performed by First Advantage, but rather by "one of 30 federally certified laboratories in the United States."[116]  Upon the return of a positive drug test from one of these facilities, the medical review officer assigned to the case is tasked with determining *via* telephone conference with the donor if there is a legitimate medical explanation for the substance reported, and thereafter requesting prescription information which would be verified at the pharmacy. [117]

Unlike the policy in *Rowles*, the instant drug policy as implemented takes into consideration valid medical prescriptions, and, if properly utilized by Ms. Wilkinson, would likely have prevented the harsh result incurred here— termination.  Indeed, per the testimony of Dr. Hoffman, First Advantage would instead "send a safety concern letter to the employer" or recommend that an employee "undergo a fitness for duty examination by a physician" if a substantial question remained following testing as to whether an employee is medically fit to do the job.[118]

Second, the undisputed facts indicate that the way in which positive test results are reviewed does not unduly intrude upon an employee's seclusion, or the

---

[116]  Dep. of Stuart Hoffman (ECF No. 29-4), at 14:9-12.

[117]  Def.'s Statement of Material Facts ¶¶ 43-44, at 6; Pl.'s Answer to Def.'s Facts ¶ 43-44, at 5.

[118]  Dep. of Stuart Hoffman (ECF No. 29-4), at 14:21–15:9.

protection of their private medical information.  Indeed, in Dr. Hoffman's

deposition, he described the review process as follows:

> Q. Okay. When an employee tests positive for drugs, do you have any
> understanding as to what First Advantage does in terms of reporting
> that information back to the company that hired them?
>
> A. Yes, we -- if the test is negative, it goes very quickly. If-- either the
> same day or the next business day. If the test is nonnegative, then it is
> reviewed by a medical review officer and that officer then attempts to
> interview the donor to determine whether or not they have a legitimate
> medical explanation for the substance that the laboratory reported.
>
> Q. So how does the legitimate process -- or how does the process
> work to find out whether there's a legitimate reason for the drugs; in
> other words, the employee has to submit documentation by fax or by
> e-mail or something along those lines?
>
> A. Yes, the medical review officer telephonically interviews the donor
> and asks various questions and then usually culminating in a request
> for prescription information, which would be verified at the
> pharmacy.
>
> . . .
>
> Q. So within 24 hours a donor is expected to get some type of
> confirmation from the pharmacist indicating that they had a
> prescription; is that what you are saying?
>
> A. No, the donor is to notify us either directly to the MRO or put it
> onto a telephonic recording that we take the information from.[119]

Based on this process as outlined, it is clear that an employee's positive test

result, potentially caused by the ingestion of prescription drugs for a medical

ailment (as for Ms. Wilkinson), is first reviewed by a medical review officer to rule

---

[119] *Id.* at 9:2-22; 12:2-8.

out any medical explanations. Therefore, while Ms. Wilkinson avers that this employer policy violates public policy because it authorizes "blanket discharge for any type of medication, regardless of whether it is prescribed by a physician," this assertion is in fact belied by the process of review as outlined by Dr. Hoffman. This testing procedure, utilizing a medical review officer tasked with reviewing an employee's medical history for a legitimate reason for the positive result, protects the employee's personal information in a way directly in contrast to the test utilized in *Rowles*. As previously noted, that case involved a drug policy which mandated disclosure of all prescription drug use to an employer supervisor.[120]

Given these important distinctions with *Rowles*, and upon application of the *Borse* balancing test, I find that no facts remain from which a reasonable jury could find that the instant drug policy, in word or implementation, is "highly offensive" to a reasonable person. Having previously detailed the implications which this drug policy has on employee's privacy interest, I note that "employer's interest in maintaining a drug-free workplace" is unquestionably heightened by the nature of Defendant's business—transporting children—and the presence of a government mandate requiring such a policy.[121]

---

[120] *Rowles*, 1999 U.S. Dist. LEXIS 21605, at *38.

[121] Def.'s Statement of Material Facts ¶ 31, at 4; Pl.'s Answer to Def.'s Facts ¶ 31, at 4.

Pursuant to *Borse*, Counts IV and V of Ms. Wilkinson's Complaint, or wrongful discharge based in tort and invasion of privacy/intrusion upon seclusion, fail and summary judgment will therefore be entered in favor of Defendant on these claims.

## IV.    CONCLUSION

Based on the above reasoning, Defendant Marvin E. Klinger, Inc.'s Motion for Summary Judgment is granted in its entirety. The Clerk is therefore directed to enter final judgment in favor of Defendant and to close this case.

An appropriate Order follows.

BY THE COURT


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge